**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **8:19CR389** |
| **vs.** | |
| **RAYMUNDO HERNANDEZ-RUBIO,** | **MEMORANDUM AND ORDER** |
| **Defendant.** | |

This matter is before the Court on the Findings and Recommendation (F&R), ECF No. 43, issued by Magistrate Judge Susan M. Bazis. The Magistrate Judge recommended that the Motion to Suppress filed by the Defendant Raymundo Hernandez-Rubio, ECF No. 27, be denied. The Defendant filed an Objection to the F&R, ECF No. 44, and Brief, ECF No. 45, as allowed by 28 U.S.C. § 636(b)(1)(C) and NECrimR 59.2(a). For the reasons set forth below, the F&R will be adopted, and the Motion to Suppress will be denied.

### BACKGROUND

The Defendant is charged with one count of possession with intent to distribute methamphetamine. Indictment, ECF No. 1. He seeks to suppress any evidence obtained by law enforcement on December 7, 2019, from a search of his vehicle during a traffic stop, and a search of a residence on Seward Street in Omaha, Nebraska. He argues that the officer unreasonably prolonged the traffic stop and the search of the vehicle exceeded any probable cause. He also argues that officers lacked consent to search the residence without a warrant. He does not directly object to the Magistrate Judge's factual findings, but objects to her recommendations based on those findings. Having reviewed the record,

the Court adopts the Magistrate Judge's factual findings and provides the following in summary:

***Traffic Stop***

The Drug Enforcement Administration (DEA) began investigating the Defendant in October 2019, after he delivered drug proceeds to an undercover officer. The Defendant delivered the money in a blue Chevy Equinox that was registered to Viridiana Perez. (Tr. 68.)[1] After the Defendant delivered the money, investigators obtained a warrant to install a GPS tracker on the Equinox. In early December 2019, law enforcement installed the tracker on while the Equinox while was parked outside Perez's Seward Street residence. (Tr. 68-69.) After the tracker was installed, investigators monitored the Equinox's movements. (Tr. 69.)

On the morning of December 6, 2019, investigators observed the Defendant exit the residence alone, get into the driver's side of the Equinox, and leave Omaha. GPS monitoring showed the Equinox left Omaha and began traveling east into Iowa. Later that day, the Equinox arrived in the Chicago, Illinois, area. (Tr. 69). According to GPS data, the Defendant was in the Chicago area for approximately two hours. (Tr. 70-71.) Dennis O'Connor, a Bellevue Police Detective and DEA Task Force Officer, testified that the Defendant's stay was typical of someone picking up drugs or drug proceeds.

At approximately 11:30 p.m. on December 6, 2019, Nebraska State Patrol (NSP) Sergeant Kurt Frazey advised Trooper Jeremiah Foster that a blue SUV was returning from Chicago to Omaha and investigators wanted a traffic stop of the vehicle. (Tr. 8; 61.) Sgt. Frazey told Trooper Foster that the driver of the vehicle was the target of a federal

---

[1] References to "Tr." are to the Transcript of Evidentiary Hearing that appears at ECF No. 42.

investigation and there was a GPS tracking device on the vehicle. (Tr. 8.) Sgt. Frazey predicted the vehicle would arrive in the Omaha area between 5:00 a.m. and 6:00 a.m. on December 7, 2019. (Tr. 9.)

Trooper Foster went on duty around 5:00 a.m. on December 7, 2019. He positioned himself on Interstate 80 near 13th Street in Omaha. (Tr. 9.) Investigators indicated to Trooper Foster that they followed the subject SUV and they provided Trooper Foster with the vehicle's license plate number. When Trooper Foster saw the Equinox, he entered the interstate and began following it and waiting for the Defendant to commit a traffic violation. (Tr. 10.) Trooper Foster observed the Defendant fail to signal a lane change, and Trooper Foster initiated a traffic stop.

After initiating the stop, Trooper Foster asked the Defendant for his identification, vehicle registration, and insurance. The Defendant produced a U.S. employment card, but did not have a valid driver's license or proof of insurance. (Tr. 15; Ex. 1.) Because the Defendant did not have a license, Trooper Foster asked him to go to the patrol truck to continue the conversation. Trooper Foster asked the Defendant for biographical information and about his travel itinerary. (Tr. 16; TR 62; Ex. 1.)

The Defendant stated he was tired because he was traveling back from Des Moines after fixing his car, which had broken down. The Defendant explained that the car broke down just past Des Moines, so he had to take an Uber back to Omaha. The Defendant said it took him about an hour to get back from Des Moines and he arrived back in Omaha around 3:00 a.m. The Defendant said that he and his wife—Perez—then drove their other vehicle back to Des Moines. The Defendant said it took two hours to fix the car in Des Moines and he was driving it back to Omaha when he was stopped by

Trooper Foster. Later in the conversation, the Defendant told Trooper Foster that he and Perez had been in Chicago and their car broke down in Des Moines at which point he and Perez returned to Omaha by Uber.

During the conversation, Trooper Foster prepared a traffic citation and performed criminal history checks. (Tr. 17; TR 38.) Because the Defendant did not have a driver's license, Trooper Foster had to enter all his information into the computer system manually for the local record check and the citation. (Tr. 17; 47-48.) Trooper Foster issued the Defendant a citation for the moving violation and for driving on a suspended license. The traffic stop lasted twenty-seven minutes from the initiation of the stop to the point of the citation being issued. (Tr. 24.)

After completing the traffic citation, Trooper Foster asked the Defendant if he would answer a couple more questions (Tr. 24.) The Defendant agreed. Trooper Foster explained to the Defendant that his timeline and travels made Trooper Foster suspicious of illegal activity. In response, the Defendant offered to let Trooper Foster search the Equinox, without Trooper Foster first requesting consent to search. (Ex. 1, 26:53; Tr. 24.) Trooper Foster asked the Defendant to confirm that Trooper Foster had permission to search the Equinox. The Defendant nodded and said "uh-huh." (Ex. 1, 27:00.)

After searching the Equinox for approximately ten minutes, Trooper Foster returned to his patrol truck and asked the Defendant about the spare tire in the rear passenger compartment of the Equinox. Although there was a factory spare tire in the Equinox, the Defendant told Trooper Foster that he had the other spare tire in the back because he did not trust the factory spare. Trooper Foster told the Defendant that he did not think the tire in the back of the Equinox would fit on the Equinox and he observed that

the spare tire was flat. Trooper Foster asked if there was anything in the tire.  The Defendant initially said no, but then stated he did not know. The Defendant said he got the tire when he was in Chicago. Trooper Foster testified that there were tool marks and other damage on the tire and it felt heavier than a low-profile tire. Trooper Foster also stated that when he took the tire out and attempted to bounce it on the ground, it had made a thud and did not bounce like a normal tire. (Tr. 27.)

Trooper Foster advised the Defendant that he wanted to take the Equinox back to the NSP office so he could safely examine the vehicle and spare tire. (Tr. 25-26.) The Defendant did not object to going to the NSP office and did not withdraw his consent to the search of the Equinox. (Tr. 29-30.) After approximately thirty minutes, a tow truck arrived on scene and the Equinox was towed to the NSP office. (Tr. 27-28.) The Defendant was not handcuffed at any point during transport to the NSP office or while the Equinox was searched at the NSP office. (Tr. 57-58). Trooper Foster testified that the Defendant did not revoke consent to search the Equinox at any point. (Tr. 26-27.)

At the NSP office, officers cut open the spare tire and located fourteen cellophane-wrapped packages. (Tr. 29.) Those packages were later determined to contain methamphetamine. (Tr. 29.) Officers also seized approximately $4,000 from the Equinox. (Tr. 74.) The Defendant was arrested, placed in handcuffs, and taken to the Douglas County Correctional Center to be booked. (Tr. 57-58.)

### *Search of the Residence*

Later, on December 7, 2019, Detective O'Connor went to the Seward Street residence—at the Defendant's request—to return jewelry to Perez. (Tr. 75.) Officers also hoped to get permission to search the residence for further evidence. (Tr. 75.) Detective

O'Connor was accompanied to the residence by Trooper Foster, Sgt. Frazey, Agent Paul Muzquiz, Agent Matt Myers, Agent Hailey Anderson, and Task Force Officer Daryl Krause. (Tr. 74.)

Perez answered the door and Detective O'Connor introduced himself and explained that the Defendant had given them jewelry to return to her. (Tr. 100.) Officers told Perez that the Defendant had been arrested with a large amount of methamphetamine. (Tr. 76.) Perez testified she was "freaked out" when she saw the investigators because she did not know what was going on and they were surrounding her house. (Tr. 100.) Perez testified that she saw several officers outside her home. (Tr. 101.) Agent Muzquiz testified that Perez was very calm and relaxed when she spoke to investigators on the porch and that she did not express any doubt or concern about what was happening. (Tr. 121.) At the time the officers arrived, Perez's oldest son and daughter-in-law, as well as several small children, were in the residence. (Tr. 76; Tr. 100.)

Perez permitted officers to search the residence. (Tr. 76-77; Tr. 101.) Once investigators were inside, Perez explained that the Defendant did not live at the residence, but that he stayed there on occasion. (Tr. 76; Tr. 101.)  She said that when the Defendant was there, he stayed in her bedroom, which Perez indicated was on the second floor of the residence. (Tr. 76.) Detective O'Connor testified that Perez directed investigators to her bedroom. (Tr. 77.)

Detective O'Connor, Agent Anderson, Agent Muzquiz, and Agent Myers searched the bedroom and found cell phones, two ledgers, and two bags that contained approximately $130,000. (Tr. 80.) Perez told officers she did not know these items were in the bedroom and that they did not belong to her. (Tr. 80.) Officers searched the

6

bedroom for forty to forty-five minutes and were at the residence for approximately one hour and twenty minutes. (Tr. 83-84.) Detective O'Connor testified that Perez never revoked consent or told investigators that they could not look in certain areas. (Tr. 80.) Agent Muzquiz testified that Perez was cooperative during the search. (Tr. 125.) Following the search, Perez signed a Consent-to-Search form that gave officers permission to search all items they took from the residence. (Tr. 95, 106-107, 127; Ex. 2.) Agent Muzquiz testified that Perez did not express any difficulty understanding the form. (Tr. 125.)

## STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(C) and NECrimR 59.2(a), the Court shall make a *de novo* review of the portions of the Magistrate's Findings and Recommendation to which objections have been made. The Court may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings and recommendations. The Court may also receive further evidence or remand the matter to the Magistrate Judge with instructions.

## DISCUSSION

The Defendant objects to the Magistrate Judge's conclusions that Trooper Foster had reasonable suspicion to extend the traffic stop, and that the Defendant consented to the search of the tire.  The Defendant also objects to the Magistrate Judge's conclusions that he had no expectation of privacy in the residence, and that police relied on proper consent to search.

## I.  Duration of Traffic Stop

### A.  Reasonable Suspicion to Extend Stop

The Defendant argues that the Magistrate Judge erred in finding that Trooper Foster knew the Defendant's representations about his travels were false, and therefore Trooper Foster lacked a reasonable suspicion to extend the traffic stop.

Under the Fourth Amendment, "an officer conducting a traffic stop who discovers information leading to reasonable suspicion of an unrelated crime may extend the stop and broaden the investigation." *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016). "After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *United States v. Englehart*, 811 F.3d 1034, 1040 (8th Cir. 2016) (quoting *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013)). These tasks may involve "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

Trooper Foster's questions about the Defendant's travels were reasonably related to the purpose of the stop. *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994) ("[A] reasonable investigation of a traffic stop may include . . . requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose" of the trip). Because the Defendant did not have a driver's license, Trooper Foster had to obtain and

manually enter Defendant's information to perform criminal background checks. These tasks were reasonably related to the purpose of the stop and there is no evidence that Trooper Foster unreasonably prolonged this portion of the stop to broaden his criminal investigation.

Absent reasonable suspicion, an officer may not broaden the investigation "beyond the time reasonably required to complete the mission" of issuing a citation. *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (quoting *Caballes*, 543 U.S. at 407). The reasonableness of the length of a traffic stop and a resulting detention are fact-based questions, and a traffic stop is not subject to a defined limit. *United States v. Riley,* 684 F.3d 758, 765 (8th Cir. 2012). Yet detention "beyond completion of the traffic infraction investigation" must be supported by "reasonable suspicion of criminal activity." *Rodriguez,* 135 S. Ct. at 1616-17.

In order to establish reasonable suspicion, "'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' further investigation." *Woods*, 829 F.3d at 679 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Although some factors may appear innocent when considered alone, "a combination of factors may give rise to reasonable suspicion." *United States v. Briasco*, 640 F.3d 857, 860 (8th Cir. 2011). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Beck*, 140 F.3d 1129, 1137 (8th Cir. 1998) (quoting *United States v. Halls*, 40 F.3d 275, 276 (8th Cir. 1994)).

The Defendant asserts that the Magistrate Judge erroneously concluded that Trooper Foster knew Defendant's story was false.  Defendant argues that Trooper Foster only knew that the Equinox was under "federal investigation" and he had no information about the prior whereabouts of the Equinox.  However, Trooper Foster was told that the Equinox was returning from Chicago to Omaha and the Defendant initially told Trooper Foster that he was returning from Des Moines but did not mention Chicago.  The Defendant claimed that he took an Uber from Des Moines and arrived in Omaha at 3:00 a.m. before returning to Des Moines with his wife where it took him two hours to fix the Equinox before driving back to Omaha. Trooper Foster stopped Defendant at 6:20 a.m. and was reasonably skeptical about how the Defendant was able to go back and forth between Des Moines and Omaha so quickly.  The Defendant later altered his explanation, stating that his wife had gone with him to Chicago and returned with him from Des Moines via Uber.  Based on the totality of the circumstances, the Magistrate Judge did not err in concluding that Trooper Foster had a particularized suspicion to extend the stop.

### B. Defendant's Consent and Probable Cause to Open the Tire

Defendant argues that law enforcement exceeded the scope of his consent to search when they removed the spare tire from the Equinox at NSP headquarters and cut it open with power tools.

"The boundaries of a consensual search are confined to the scope of the consent." *United States v. Garcia-Garcia*, 957 F.3d 887, 895–96 (8th Cir. 2020) (quoting *United States v. Shafer*, 608 F.3d 1056, 1064 (8th Cir. 2010)).  "As with consent generally, 'to determine the scope, we consider what 'the typical reasonable person would have

understood by the exchange between the officer and the suspect.'" *Id.* at 896 (quoting *Shafer*, 608 F.3d at 1064).

Where a defendant gives unqualified consent to search a vehicle, law enforcement may take the vehicle to a second location to continue the search. *See United States v. Zamora-Garcia*, 831 F.3d 979, 982 (8th Cir. 2016) (no Fourth Amendment violation where defendant gave unqualified consent to search and "did not object or otherwise withdraw his consent" when police took defendant's vehicle to headquarters). The Defendant volunteered to let Trooper Foster search the Equinox before Trooper Foster could ask for Defendant's consent. Thereafter, the Defendant observed Trooper Foster remove the tire from the vehicle and the Defendant answered questions about the tire. The Defendant did not object or withdraw consent when Trooper Foster had the Equinox towed to NSP headquarters.

Although the Defendant gave general consent to search the Equinox, "general consent to a search does not give law enforcement officers license to destroy property." *Zamora-Garcia*, 831 F.3d at 983. "Cutting or destroying an object during a search requires either explicit consent for the destructive search or articulable suspicion that supports a finding that probable cause exists to do the destructive search." *Id.* (quoting *United States v. Guevara*, 731 F.3d 824, 830 (8th Cir. 2013)). "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *United States v. Gunnell*, 775 F.3d 1079, 1084 (8th Cir. 2015) (quoting *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013)). In evaluating whether this standard is met,

courts "have consistently looked to the totality of the circumstances." *Gunnell*, 775 F.3d at 1085 (quoting *Harris*, 133 S. Ct. at 1055).

"The warrantless search of an automobile, 'predicated on consent, may be expanded beyond the scope of the consent when it yields a basis for a reasonable articulable suspicion that additional contraband may be found in parts of the car not included in the consent.'" *United States v. Alverez*, 235 F.3d 1086, 1089 (8th Cir. 2000) (quoting *United States v. Casares-Cardenas*, 14 F.3d 1283, 1286 (8th Cir.1994)). In other words, law enforcement may lawfully expand the scope of a search where observations made during a consensual search give officers probable cause to believe that there is contraband in the vehicle. *Id.* In *Alverez*, police damaged a spare tire while searching for suspected contraband. *Id.* Although police found the tire during a consensual search, they did not have consent to damage the tire to search its contents. *Id.* Nevertheless, the Eighth Circuit held that a complete search of the tire was supported by probable cause because the defendants did not attempt to use the tire when it had been needed and because the tire made a thudding sound, suggesting it was being used as a container. *Id.* Accordingly, although police did not have consent to search the tire, the information they obtained during the consensual search supported a finding of probable cause. *Id.*

As in *Alverez*, Trooper Foster's observations during the consensual search provided probable cause to search the tire. Trooper Foster observed the spare tire in the passenger compartment and noted that it did not appear to fit the Equinox. He also observed a factory spare tire stored beneath the Equinox. In Trooper Foster's training and experience, these observations suggested that the tire was being used as a compartment. The tire made a thud when bounced; it was not inflated; and it contained

evidence of tampering.  As in *Alverez*, the totality of these circumstances supports a finding of probable cause.

## II. Consent to Search the Residence

The Defendant argues that the Magistrate Judge erred in concluding that he did not have a right to privacy in the residence, and that Perez had authority to consent to the search of the Defendant's bags and notebooks.[2]  Even if the Defendant had a right to privacy in the residence, Perez's consent was unqualified, and a reasonable officer would understand that Perez consented to a search of the items.

"[C]onsent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974). "Consent is valid when an officer reasonably relies on a third party's demonstration of apparent authority over the premises." *United States v. Cross*, 888 F.3d 985, 989 (8th Cir. 2018).  "A third party has apparent authority when 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.'"  *Id.* (quoting *United States v. Amratiel*, 622 F.3d 914, 916 (8th Cir. 2010). Once consent is given, "[t]he boundaries of a consensual search are confined to the scope of the consent."  *Garcia-Garcia*, 957 F.3d at 895 (citation omitted).  The scope of consent "depends on what 'the typical reasonable person' would have understood by the exchange between the officer and the suspect." *United States v. Steinmetz*, 900 F.3d

---

[2] The Defendant also argued that Perez's consent was invalid because she did not sign the consent form until after the items were searched.  Following the search, Perez signed a Consent-to-Search form that gave officers permission to search all items they took from the residence. (Tr. 95, 106-107, 127; Ex. 2.)  For the reasons stated, Perez had already given her consent to search when officers found the bag and notebooks.  The consent form was not a request to search the home, it was a receipt of the items taken from the home.  (Tr. 107.)

595, 600 (8th Cir. 2018), *cert. denied,* 139 S. Ct. 948 (2019) (quoting *Florida v. Jimeno*, 500 U.S. 248, 252 (1991)).

Even if the Defendant had a right to privacy in the residence, law enforcement reasonably relied on Perez's unqualified consent to search. Perez admitted that she permitted officers to search the residence (Tr. 101) and officers explained to her the reason they wished to search the residence (Tr. 76-77). When officers found a bag in the bedroom closet, Perez specifically consented to the search of the bag. (Tr. 105.) At no point did Perez limit her consent. Based on the totality of the circumstances, officers reasonably relied on Perez's consent to search the residence, including the items belonging to the Defendant.

## CONCLUSION

For the reasons discussed, the Findings and Recommendation will be adopted, and the Motion to Suppress will be denied.

IT IS ORDERED:

1.      The Findings and Recommendation, ECF No. 43, are adopted;

2.      The Motion to Suppress filed by Defendant Raymundo Hernandez-Rubio, ECF No. 27, is denied; and

3.      The Objections to the Findings and Recommendation, contained in ECF Nos. 44 and 45, are overruled.

Dated this 9th day of June 2020.

BY THE COURT:

s/Laurie Smith Camp
Senior United States District Judge